ELYTON LAND CO. v. McELRATH et al.

(Circuit Court of Appeals, Fifth Circuit. January 16, 1893.)

No. 83.

1. WILLS—RULES OF CONSTRUCTION.
    The general principles relating to the construction of wills are not controlling, but are merely advisory, and in doubtful cases the court must ascertain, from all the facts surrounding the testator, his property, and those to whom it was left, what was probably his intention.

2. SAME—CONSTRUCTION—LIFE ESTATE AND REMAINDER.
    Testator devised to his wife "the Horses and farm with all their appurtenances, and after such Horses and Cattle, and other articles are sold for the payment of debts of the balance of the Stock, Horses, Cattle, Hogs, and all other articles, shall be hers, and at her disposal, also my negro woman Rose and her two children Jordan and Julia and increase shall be hers and at her disposal during her natural life." After making provision for the support of his mother and sister, who were living upon the farm, during their lives, the testator further provided that "at the death of my wife, that whatever may remain of my estate be sold and appropriated to missionary purposes." Testator was unacquainted with the use of technical legal terms. His farm was poor and unproductive, and the amount of personal property was small; and, if the will were held to give his wife only a life estate, she would derive only a bare subsistence therefrom. The Alabama statute (Code, § 1824) provides that every estate in land is to be taken as a fee simple, although words of inheritance are not used, unless it clearly appears that a less estate was intended, and that (section 1949) every devise of land must be considered to convey all the estate of the devisor, unless it clearly appears that the will intended to convey a less estate. *Held,* that it was evidently not the testator's intention to deprive his wife of the power of selling the fee in the land, and under these statutes she had full power to convey the same.

3. LIMITATION OF ACTIONS—ADVERSE POSSESSION—ENTRY.
    The widow conveyed the land for full value, and in fee simple, with warranty, and shortly afterwards the vendee put a man on it as his tenant. He, however, allowed the widow to reside on the land until her death,

which occurred a little over three months after the conveyance. *Held*, that under Code Ala. § 2620, which provides that when a right of entry on lands accrues the entry must be considered as having been made, the grantee held the land as owner in fee from the date of the widow's death; and, even if it be conceded that the testator's heirs were entitled in remainder, the 10-years statute of limitations began to run against them from that date.

**4. ADVERSE POSSESSION—PRESUMPTION OF CONTINUANCE.**

In Alabama, adverse possession, being once shown, is presumed to continue until the contrary appears. Abbett v. Page, 9 South. Rep. 332, 92 Ala. 571; Marston v. Rowe, 43 Ala. 271,—followed.

In Error to the Circuit Court of the United States for the Northern District of Alabama.

At Law. Action in the nature of ejectment by Mary E. McElrath, Linda E. Timmons, and Margaret C. McElrath against the Elyton Land Company. Verdict and judgment for plaintiffs, and defendant brings error. Reversed. ·

Statement by LOCKE, District Judge.

This was an action in the nature of an ejectment under the statute of Alabama, brought by defendants in error, as heirs at law of John Timmons, to recover 200 acres of land which had been owned and occupied by him as a farm, and outlying woodland, in Jefferson county, Ala., and which is, in a large part, at present, covered by the city of Birmingham. At the death of John Timmons, which occurred in 1855, he left a will, in the following words:

"In the name of God, Amen. I, John Timmons of Jefferson County, in the State of Alabama, and however in bad health, still in perfect soundness of mind and disposing memory, thanks be to God, who hath so far preserved me, do make and publish this my last will and testament in manner and form following, that is to say, first & principally, I recommend my secret into the hands of Almighty God, and my body I request to be buried in a decent manner, hoping at the general resurrection I shall receive the same soul and body united by the mighty power of God, and as touching such worldly estate as it hath pleased God to bless me with in this life,—First—I will that in order to satisfy all debts that I owe, that my negro man Frank be sold and such Horses, Cattle and all other articles that my wife does not wish to keep, and secondly, I give and bequeath to my beloved wife the Horses and farm with all their appurtenances, and after such Horses and Cattle, and other articles are sold for the payment of debts of the Stock, Horses, Cattle, Hogs, and all other articles, shall be hers, and at her disposal, also my negro woman Rose and her two children Jordan and Julia and increase shall be hers and at her disposal during her natural life. Thirdly,—I will that my mother and sister have a peaceable possession of the House and place, where they now live while they are disposed to continue there, and that they be paid over one hundred dollars in money when it can be collected, and further that they have a comfortable support from the farm during their natural lives, or as long as they live where they now live, but if they leave to be (but if they leave to be) under no further obligations to them, and with regard to Lydia A. Greswood when she leaves I will that my wife shall be at liberty to give her any property and articles she may think proper to give, and lastly at the death of my wife, that whatever may remain of my estate be sold and. appropriated to missionary purposes, and I do hereby constitute and ordain my beloved wife and W. H. McMath my executors of this my last will and testament.—and witness whereof I the s'd John Timmons have set my hand and seal this tenth day of Aug. 1855. John Timmons. [L. S.]"

This will was duly probated, and its validity is not in question. At the time of his death, John Timmons left his wife residing on his farm; and in a small house, a short distance from his own, his mother and sister. Lydia A. Greswood was a girl that he had taken into his family and brought up. His property consisted of the land in question; four negroes,—a man, Frank, a woman, Rose, and two small children, Jordan and Julia; three horses, and a small

stock of cattle,—some three or four, one witness thinks. He left no children. The plaintiffs in the court below, defendants in error, are children of his brother. His mother and sister continued to reside in the small house which they had occupied until some time in 1861, when they removed to South Carolina, and his wife, Sarah, continued to occupy the old homestead, and on December 18, 1867, sold the land for full value and by warranty deed, conveying it in fee simple to A. J. Waldrop. He entered and took possession, but permitted Sarah Timmons to remain until her death, which occurred March 28, 1868. After the execution of the deed to Waldrop, and before the death of Sarah Timmons, Waldrop put a man by the name of Barton on the place, who occupied as his tenant and made one crop. The testimony is that he stayed a year, and perhaps more. December 22, 1868, one year and four days after he had purchased it from Sarah Timmons, Waldrop, for full value and by warranty deed, sold the entire tract to Martha E. Clift, who, it appears from the testimony, took possession before Mr. Barton left. She continued in possession until she sold a part of the land to Alburto Martin, the 3d of May, 1870, and the rest to Josiah Morris, December 21, 1870, reserving two acres, upon which she resided, giving at the same time a bond to convey the two acres at some time subsequent. Josiah Morris and wife sold to the Elyton Land Company, 28th of February, 1871; and Alburto Martin and wife sold to the same party, August, 1871. The two acres reserved by Martha E. Clift were deeded to the same party 24th December, 1873. Upon purchasing from Morris and wife, February, 1871, the Elyton Land Company began a survey of the entire tract; caused the outside lines to be ascertained and marked, lines of streets and avenues run out, and partially cut out and staked; removed the old fences from the cleared land; and cut and sold the wood from the lines of the streets and avenues. It published a map of the land, with streets and avenues, and commenced advertising and selling lots. Numerous lots were sold, and houses erected, on the land in question, over 400 having been erected since 1871 on the land in dispute. There was no evidence of any claim of possession adverse to the Elyton Land Company until, early in 1880, one Henry Morrow entered upon the 40-acre lot now in dispute,—the N. W. ¼ of the S. W. ¼ of section 6, which was then heavily wooded, and built himself a little cabin on it, which he occupied. He says there was no one else in possession, and he cleared and fenced about three acres, partly on the land in dispute and partly beyond the line. In 1883 the officers of the land company—they say, as soon as they learned of his being there—commenced a suit to evict him, which being appealed, no final conclusion was reached until 1887, when it was decided in favor of the land company, and he was evicted. Upon the trial in the court below, defendant then, plaintiff herein, set up title under the deed from Sarah Timmons through Waldrop, Clift, and Morris, and pleaded the statute of limitation. The court instructed the jury, in substance, as is shown by the bill of exceptions and assignment of errors, among other things complained of, that the will of John Timmons gave his wife, Sarah, but a life estate; that upon her death the heirs became the true owners, and constructively in possession; that Waldrop, after the death of Sarah Timmons, held for the heirs, but could not become the owner by his title; that the point at which the adverse possession must commence, to make 10 years of limitation, was when Morris purchased from Clift; that Waldrop's possession was not adverse possession, and could not be invoked to work out the 10 years. Under this charge, the principal points of which were excepted to at the time, the jury returned a verdict for the plaintiffs for the N. W. ¼ of the S. W. ¼ of section 6, township 18, range 2 W., described in the complaint, and assessed the plaintiffs' damages at $15,600. Whereupon the plaintiff in error sued out a writ of error, and assigned therefor 41 grounds, the principal of which are that the court charged the jury as above stated, and in addition thereto refused to give the instructions asked, as follows: That, possession being once established by proof, it must be presumed to continue until there is evidence of an adverse possession by somebody else, and the party claiming that the original possession, if proved, has not continued, must reasonably satisfy the jury of the fact. There were numerous other exceptions and assignments of error, but the foregoing are all that it has been deemed necessary to consider.

Alex. T. London, for plaintiff in error.

Geo. Westmorland, Thos. H. Watts, Geo. M. Marks, and Gordon Macdonald, for defendants in error.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

LOCKE, District Judge. The two principal grounds of error which require examination are: First, the charge of the court in regard to the construction of the will of John Timmons; second, the date of the commencement, and the presumption of continuance, of the statute of limitation.

In the construction of all wills, unquestionably, the intention of the testator is the governing principle,—the point to which all examination should be directed. 2 Bl. Comm. 499; Inglis v. Sailors' Snug Harbour, 3 Pet. 99; Finlay v. King, Id. 346; Smith v. Bell, 6 Pet. 68; Given v. Hilton, 95 U. S. 591. The circumstances of each individual case vary so much from those of most other cases that it is difficult to determine from the explanation or the construction of one will what would control in the construction of another; and, although there may be general principles tending to assist courts in determining the intention of the testator, yet they can be but advisory, and not controlling. Such rules are to be used as helps towards reaching the intention of the testator, "making them our servants rather than our masters." 1 Redf. Wills, 420. It is in many cases impossible to determine, beyond the possibility of a doubt, what the intention of the testator was; and all that can be done is to ascertain, from all the facts and circumstances surrounding him, his property, and those to whom it is left, and the language of the will, what probably was intended. A careful examination of the numerous cases cited by counsel on each side satisfies us that that has been the controlling principle. In this case both the testator and the party who drew up his will were unlettered men, unlearned in the technical terms of the law or the artificial meanings which have attached to such expressions, and to neither of them would the legal terms, "life estate," "fee simple," or "remainder," probably present any clear and distinct idea of property or rights of property. The terms "his" and "hers" can safely be presumed to denote their idea of entire possession or ownership. The testator was a man of small property, consisting more largely of slaves than of any other class. He had, to some extent, made his living, and accumulated what property he had, by running a hack line from Elyton to Blount Springs, with the horses he directed to be sold, and had not relied solely upon his farm. The landed estate was such as could bring no rents, profits, or income, without being carried on by manual labor. Much of the land was in wood and timber, —rough, rocky, and hilly,—not regarded as fit for cultivation; and some of the cleared land was poor and low. His wife, the only member of his family, would necessarily be the principal object of his interest, and the one in whose welfare he would be most directly concerned. In his anxiety to provide for the payment of all his debts,

he had willed that his negro man, Frank, should be sold, and also his horses and such cattle and all other articles as his wife did not wish to keep, but the rest was to be his wife's, unless the subsequent conditions should defeat or modify such devise. The one important question in this case, in regard to the construction of the will, is whether the language, "during her natural life," shall be held to imply a limitation upon the right of his wife, Sarah Timmons, to dispose of any of the property by alienation. Such restriction, if held applicable to the farm, would necessarily apply to all of the property, both real and personal, and would prohibit her from disposing of more than a life interest in any of it. It is apparent there were certain things clearly intended by his will: First, that the testator wanted to have his debts paid by the sale of his negro man, and such horses and cattle and other articles as his wife did not care to keep. Next, that the horses and farm, with all its appurtenances, and all other articles, should be his wife's, and at her disposal, and the negro woman, Rose, and her two children and increase, should be hers, and at her disposal, during her natural life, and that his mother and sister should be provided for, to a certain extent. The other provisions of the will may be examined to assist in determining what his intention was in the use of the term, "during her natural life," for upon what that intention was this entire question depends. Had the will not been punctuated, there would be but little difficulty in determining that the term "during her natural life" only related to the disposal of the woman Rose and her children, with which it is most directly connected, as the principle laid down by Mr. Jarman in his Rule 18, (Jarm. Wills, p. 706,) that, "where the testator uses an additional word or phrase, he must be presumed to have an additional meaning," may be well applied. The first list of articles, horses, farm, etc., had been declared to be his wife's, and at her disposal; then Rose and her children should be hers, and at her disposal, during her natural life. The first unlimited use of the term "disposal," followed by its second use, directly modified and limited by the words, "during her natural life," would be a strong presumption of an intentional modification, and the comma separating the clauses denoting the disposal would add to that presumption. When the form of the expression is varied in relation to the different devises the presumption is that the intention of the testator is different.

But admitting that the limiting clause, "during her natural life," may have been intended to refer to the term "disposal" in both cases, it is not considered that then it would necessarily imply an intention of the testator to deprive his wife of the power of disposing of any portion of the property left to her, except as a life interest. If the limitation was intended to be applied to the farm, it must be so applied to every article of personal property except that which she might give to Lydia A. Greswood. The character and condition of his property after the sale of his negro man, Frank, and his horses, to pay debts, would not be such that in our view it can be properly presumed that it was the intention of the testator to compel his wife to retain and carry on the farm, support his mother and sister, and pay them

$100, and give a portion of the property to Lydia A. Greswood when she left, with no power to sell or dispose of anything except for her life. The only assistance she could have in this must be the one female slave with two small children. If such were the case, his liberality to his mother, sister, and Lydia Greswood, was far greater than to his wife, which we do not consider, from the relations shown to exist between them, could have been the case. We do not consider that the terms of the will and the surrounding circumstances would imply that it was the intention of the testator to compel a remainder by depriving his wife of everything except the power to procure a bare subsistence. In providing for "what might remain," he expressed in ordinary terms what his desire was regarding what might remain not disposed of at her death. The fact that such a limitation upon her power to devise what was left to her as hers might or might not be held valid in law can have no more weight in determining his intention than would his lack of knowledge that his bequest to the missionary cause was invalid for uncertainty; and if it appears that his intention was to permit alienation, and not devise, the alienation could not be prohibited because his intended prohibition of her power to devise might be held to be invalid. Judging from the everyday life of such a man as he has been shown to be, if he had intended only to give his wife the use of his estate for life, it would appear to be much more natural and probable that he would have used that direct form of expression. It would also appear much more probable that in using the term, "whatever may remain," he had reference to what she may not have consumed or disposed of at her death, rather than to the technical remainder after the life estate in what may have been disposed of by her. Any other construction would not, in our opinion, give sufficient force to the expression "shall be hers, and at her disposal." In our view it is very improbable that the idea of a remainder after the disposal of a piece of property could have entered the mind of the testator, or that, had he intended that, regardless of his wife's needs, the property should remain his estate, and be sold and appropriated to the missionary purposes, the equivocal term of "whatever may remain" would have been used. The law of Alabama makes a decision, in this view of the case, more easy, as it throws the burden of proof of anything less than a fee simple upon him who relies upon it. Section 1824 (2178) of the Code of Alabama, provides that "every estate in land is to be taken as a fee simple, although the words necessary to create an estate of inheritance are not used, unless it clearly appears that a less estate is intended." And again, in section 1949: "Every devise of land must be considered to convey all the estate of the devisor therein, unless it clearly appears from the will that he intended to convey a less estate." We do not consider that it clearly appears from this will that the testator intended to convey less than the whole estate, and it is unnecessary to examine further the laws and authorities cited upon this point.

But, if this construction of the will should possibly be incorrect, there still remains the defense of the statute of limitations. Section 2612 of the Code of Alabama provides that civil suits must be commenced, after the cause of action has accrued, within the periods pre-

scribed in that chapter; and section 2614 of the same chapter provides that actions for the recovery of lands, tenements, or hereditaments, or the possession thereof, should be commenced within 10 years. From this language the necessary conclusion is that the action must be commenced within 10 years after the cause of action has accrued. Section 2620 provides that when a right of entry on land accrues the entry must be considered as having been made, and the cause of action as having then accrued.

If, under the will, Sarah Timmons took but a life estate in the farm, but, presuming that she had a full title, conveyed the same to Waldrop by deed, he took as owner in fee and from her death held as such, and from that date the right of entry and the cause of action accrued as against him, and his possession, and the possession of all holding under him, must have been adverse to the heirs from that time; and the instruction that his possession could not be included to make up the 10 years we consider error. We also consider that the proposition contended for by the plaintiff in error, that adverse possession, being once shown, is presumed to continue until the contrary is shown, is well established to be the law of Alabama, (Abbett v. Page, 92 Ala. 571, 9 South. Rep. 332; Marston v. Rowe, 43 Ala. 271,) and it should have been so charged. It is ordered that the judgment of the court below be set aside, and the cause remanded for a new trial.